SAGINAW PRODUCTS CORPORATION,
Plaintiff-Appellee Cross-Appellant,

v.

EASTERN AIRLINES, INC., Defendant-
Appellant Cross-Appellee.

Nos. 77–1662, 77–1663.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 13, 1979.

Decided Feb. 8, 1980.

Dale S. Adams, Colista, Green, Green & Adams, Detroit, Mich., Lloyd McAulay, McAulay, Fields, Fisher & Goldstein, New York City, for defendant-appellant cross-appellee.

John F. Learman, Learman & McCulloch, Saginaw, Mich., for plaintiff-appellee cross-appellant.

Before WEICK, ENGEL and JONES, Circuit Judges.

WEICK, Circuit Judge.

The suit in the District Court was brought by Saginaw Products Corporation (Saginaw) against Eastern Airlines, Inc. (Eastern) for patent infringement.

The three United States patents in suit Nos. 3,727,946 ('946), 3,764,165 ('165) and 3,830,385 ('385) involve components of baggage trailers or carts capable of transporting half-size (LD–3) baggage containers between baggage terminal areas and jumbo (B–747) aircrafts in an airport.

A jury was waived and the trial was conducted before District Judge Pratt who heard the testimony of witnesses and examined depositions, the patents, a model of the cart in the presence of counsel, prior art and many exhibits. The only issues in the case related to validity of the patents and damages. Infringement was conceded by Eastern.

In a carefully prepared "Memorandum Opinion and Order, Findings of Fact and Conclusions of Law," consisting of 34 pages, Judge Pratt held patents Nos. '946 and '385 valid and infringed and that patent No. '165 was invalid. In another "Memorandum Opinion and Order Awarding Damages," Judge Pratt awarded damages to Saginaw for lost profits in the amount of $163,978, statutory interest from the date of his opinion, injunctive relief and costs.

Eastern has appealed to this court asserting that the District Court erred in its rulings on Eastern's affirmative defenses of obviousness under § 103 of the Patent Act of 1952 and overclaiming under § 112 of that Act and in awarding damages and costs instead of fixing a reasonable royalty. Saginaw has cross-appealed only on the alleged inadequacy of the award including the failure to treble damages and allow attorneys fees. For the reasons hereinafter set forth, we affirm.

## I

In early 1970, Eastern solicited bids from several manufacturers to construct and supply a quantity of the baggage carts and provided the specifications therefor, as found by the trial judge as follows:

"1. All components had to be easily accessible for service and maintenance.

2. Any vital unattached parts such as hitch pins or lock pins were to be secured to the equipment.

3. The trailer unit had to be capable of operating and tracking satisfactorily under a sustained speed up to 20 miles per hour.

4. Each unit had to be capable of mating at either end with a like unit.

5. The units when pulled in a train of as many as four from either direction had to 'track' so that the last unit made the same path as the first ("Ackerman steering").

6. The unit had to be capable of transferring containers in fore and aft directions and at 90 degrees to the fore and aft directions.

7. The transfer bed had to be capable of rotating 360 degrees in either direction; be rotatable by one man; to have locks which automatically engaged and locked the transfer bed at each 90 degree increment and which could be disengaged manually by a control lever.

8. Minimum towbar pull was to be a primary requirement.

9. The unit was to be designed to permit towing from either end without having to manipulate levers, pulls, pins, etc." App. I, pp. 2–3 Opinion

Saginaw and Irvin Industries (Irvin), a manufacturer, submitted bids and Eastern accepted Saginaw's design and bid. The initial order was for 325 carts which were supplied by Saginaw but it had expected to supply 1,000 carts to Eastern when needed.

Prior to filling the first order, Saginaw applied for patents on several components of the cart it had designed. The court found that "Eastern was aware of these pending patents at the very least when it began negotiating for a second order of baggage trailers." Eastern solicited bids from Saginaw, Irvin and others for additional carts. Eastern, however, advised

Saginaw that it was reluctant to accept Saginaw's bid because Saginaw was then involved in a Chapter XI bankruptcy reorganization. Eastern accepted the bid of Irvin and furnished to Irvin one of its Saginaw carts to be used by Irvin as a model for Eastern's requirements. The furnishing of the model by Eastern to Irvin was without the consent of Saginaw.

Saginaw had invested large sums of money in the development of its design for the cart. Irvin designed its own cart but it incorporated therein a number of components of Saginaw's cart which it obtained from Saginaw's model furnished to it by Eastern. As found by the District Court, these components consisted of the tow bar assembly, the eccentric locking coupling and the rotating turntable features of the Saginaw cart for which patent applications were then pending and patents later granted.

The court further found that both Eastern and Irvin had full knowledge of Saginaw's patent application and indeed their sales agreement incorporated therein, a provision for patent indemnity whereby Irvin would also assume the defense of any patent infringement action brought by Saginaw against Eastern. Irvin built and supplied Eastern with 1006 carts, all of which had copied the three design features of Saginaw's cart. Thus the real party in interest in this case is Irvin which conducted the defense of Eastern in the District Court and on appeal in this court.

## II

The invention in Patent No. '946—"Tow Bar" as found by the District Court is as follows:

a. This patent involves a 'tow bar' device which is incorporated into steered four-wheel baggage trailer carts. It is illustrated by the drawings which comprise Appendix A of this Opinion. Identical tow bars are provided at opposite ends of the carts, as manufactured by both Saginaw and Irvin (also illustrated in Sheet 2 of Appendix A).

b. The tow bar assembly includes a 'steering tongue' (18) which is connected to the frame of the cart by a 'king pin' (42). Also 'connected' to the frame by that king pin is the tow bar element" (24). Both members are freely pivotable upon the king pin (42).

c. The pivoting movement of the steering tongue is transferred through tie rods (38) to the associated pair of wheels on the cart, causing a turning motion, while the rod (42a), which is connected to the arm (43), transmits pivotal movement of the steering tongue at one end of the cart to the steering tongue at the opposite end.

d. An 'aligning lever' (136) is 'pivotably connected' to the tow bar at a pivot point (126); in the middle of the 'aligning lever,' on the horizontal axis, is an elongate slot (132a). A bearing-type steel roller (124) is mounted on the underside of the steering tongue (18) projecting from the forward end of the steering tongue (18) and is received in the slot (132a) of the aligning lever (136). This roller running in the slot is important to the leverage advantage of this device as will be noted below.

e. A 'locking mechanism' is employed to selectively couple the tow bar to the aligning lever and consequently to the steering tongue. This mechanism consists of a shaft (148) mounted in and extending through the tow bar in the horizontal axis, which is capable of being rotated. Permanently welded to this shaft is a locking pin (150) which is perpendicularly mounted to the shaft at its center, and at the ends of the rotatable shaft are welded two handles (152). When hand-operated, the handles are in the horizontal plane and point towards the steering tongue (18), the locking pin (150) will point vertically downward, in the hollow midsection of the tow bar element (24). When handles are flipped up and over

(180°) facing horizontally in the opposite direction, the shaft rotates and the locking pin hence also rotates up and into the elongated slot (132a), which 'locks' the tow bar steering tongue and aligning lever together.

f. When the locking pin is disengaged (i. e., in the downward vertical position, out of the slot) the tow bar (24) is free to pivot about the king pin (42) relative to the steering tongue (18).

g. This ability to be able to selectively lock and unlock the steering tongue and tow bar element is crucial to the achievement of two-way 'Ackerman steering' (i. e., where all the carts in a connected train must track so that each unit rides in the same path as the one before it), which was a requirement listed in Eastern's specifications. When such carts are pulled in a train, the tow bar element at the front end of each cart must be rigidly fastened both to its own steering tongue and to the tow bar element of the preceding car. However the tow bar element at the *rear* end of the cart (remembering that each cart has identical front and rear tow bar assemblies) must be disengaged from its steering tongue in order for free steering linkage movement of the rear wheels. When the Saginaw carts in train are in such positions. Ackerman steering is present.

h. The 'selective' characteristic of the locking mechanisms of the Saginaw tow bars is crucial to their 'reverse towing' ability. That is, by throwing the handles (152) in the opposite direction the train can be pulled by a towing vehicle in the reverse direction, as the tow bars facing the towing unit would then be locked and the opposing ones unlocked.

i. In order for the above procedure to operate, however (i. e., to be able to lock the assembly), the aligning lever (and hence the steering tongue, which it aligns) must be 'centered' over the tow bar unit so that the locking pin can rotate up through the slot in the aligning lever (132a).

j. It is in the operation of centering the 'aligning lever' that the roller (124) plays a vital role. Alignment of the steering tongue centrally over the tow bar element would require the exertion of considerable effort if the alignment lever were merely an extension of the steering tongue. The baggage containers carried on these carts weigh approximately 3500 pounds (full load) and that force is in turn transmitted through the frame to the tires in contact with the ground. The tires would have a high resistance to movement and that resistant force is carried by the tie rods (38) to the steering tongues at each end of the cart.

While the entire 3500 pounds will not be translated into resistant force against the steering tongue, the resistance to movement at the steering tongue is considerable. Without substantial mechanical advantage the tongue could not be manually pried into the alignment with the tow bar unit. The steering tongue unit itself pivoting around the king pin only has a mechanical advantage of 2:1. As an example, the manual attempt to align the steering tongue on a similar cart, but without the aligning lever mechanism of the Saginaw cart would require the exertion of 500 foot-pounds of force against the tongue if the resistant force was 1000 pounds.

The roller in the elongated slot, however, in conjunction with the leverage of the aligning lever provides an additional 10:1 mechanical advantage, so that in the above example, the handles would have to exert only 50 pounds of force to overcome the 1000 pounds resistant force against alignment of the tongue. This roller, run-

ning in its slot, in conjunction with the aligning lever plus provides a significant force-multiplying effect.

k. The Saginaw tow bar is designed to and does provide (1) four-wheel Ackerman steering, (2) of a train of carts of any reasonable number, (3) the direction of which may be reversed by manual operation of a selective locking system, (4) which is assisted by a unique force-multiplying alignment lever, and (5) that these were all required characteristics listed in Eastern's original bid specifications.

l. Moreover, as the Court appreciates after having personally inspected and operated these devices on carts in train, the Saginaw tow bar not only accomplished all these functions, it is also designed so that alignment and selective locking can be performed simultaneously by one person, by feel or by sight, quickly, with a minimum of effort, in cramped quarters and after a minimal amount of training. The simplicity of the design and suitability of the design to Eastern's specifications is thus quite noteworthy and a factor in consideration of the obviousness issue as discussed *infra*.

App. I, pp. 8–12 Opinion

█ The patent was presumed to be valid because it was regularly issued by the Patent Office. Offering the patent in evidence, as the plaintiff did, established a prima facie case of validity. In addition, as before stated, defendant conceded infringement. The burden of proof was upon the defendant to establish its affirmative defenses by a preponderance of evidence. 35 U.S.C. § 282 (Supplementary Pamphlet, 1955 to 1978); *Dickstein v. Seventy Corp.*, 522 F.2d 1294 (6th Cir. 1975), *cert. den.*, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976); *Rains v. Niaqua, Inc.*, 406 F.2d 275, 278 (2nd Cir.), *cert. den.*, 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969).

█ The District Court simply held that there was a failure on the part of the defendant to establish its affirmative defenses by a preponderance of the evidence. In considering the defense of obviousness, the District Court correctly applied the rule mandated by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 345 (1966). It held that the prior art patents introduced by defendant were not applicable. It rejected the opinion of defendant's expert Brian Hambleton stating that it was "neither that of a neutral or detached observer nor, arguably that of one of *ordinary* skill in the art;" moreover, some of Hambleton's own testimony would appear to be inconsistent with his opinion. Hambleton had been employed by Irvin, the real party in interest, for six years at the time of trial. It was the province of the District Court to make credibility assessments of witnesses and it is not our function to interfere therewith, when they are supported by substantial evidence.

Summarizing its factual findings, the District Court stated:

"To summarize and recapitulate, the Court finds that:

(1) The Saginaw tow bar patent ('946) incorporates at least one novel element, namely the roller bearing-in-slot mechanism associated with the aligning lever, which provides a significant and highly useful force-multiplying effect needed to align a train of carts to effect reversible Ackerman steering;

(2) While other elements of the tow bar patent (including the tow bar element, steering tongue, king pin application, rotatable locking pin) are disclosed in prior patents (i. e., Keller), the specific combination of these elements in the Saginaw configuration results in a tow bar which is capable of being used to obtain reversible, four-wheeled Ackerman steering of a train of baggage carts, in a simple and expeditious procedure—a multi-

ple capability achieved in none of the cited prior art or suggested by them;

(3) The defendant failed to introduce any detached, credible witnesses who were skilled in the pertinent art and who could attest to the 'obviousness' of the Saginaw patent." App. I, pp. 18–19 Opinion

Based upon these findings, the District Court concluded that the patent achieved a synergistic result. This patent involved the combination of many elements which were patentable under the decisions of the Supreme Court in *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *A & P Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), and the decision of this court in *Phillips Industries, Inc. v. State Stove Mfg. Co., Inc.*, 522 F.2d 1137 (1975). We also note that the patented cart complied with Eastern's specifications and it would not have purchased the 1006 carts from Irvin that did not conform to the specifications.

The conclusions of law adopted by the District Court are, in our opinion, correct.

### III

The invention in Patent '385 relates to its "turntable lock" system. Under this system the container-supporting turntable could be locked at any of the four positions relative to the cart chassis.

We approve of the factual findings of the District Court with respect to the invention, its treatment of the prior art; its rejection of Hambleton as the only expert witness offered by defendant on the subject of obviousness and its holding that defendant had not met its burden of proof that this patent is obvious to a person of ordinary skill.

### IV

For the reasons stated by the District Court, we find no merit in the affirmative defense of overclaiming. No testimony as to this defense was offered at the trial. The burden rested upon the defendant to offer such proof.

The District Court correctly concludes that it was the intent of the inventor to apply for only the specific inventions covered by the patents on suit; namely, the towbar, the selective locking turntable device, and the coupling mechanism which is apparent from the patent applications. The inventor did not intend to apply for a patent on all the elements involved on the baggage cart such as the cart itself including the wheels and tires. They are however included in a combination patent.

### V

We need not discuss the issues relating to Patent No. '165 which the District Court found to be invalid as obvious because plaintiff did not appeal from the judgment of the District Court relating to that issue.

### VI

Plaintiff contends that it was entitled to recover a reasonable profit on the 1006 carts which Eastern purchased from Irvin embodying plaintiff's inventions plus treble damages, attorneys fees, interest from the date of the filing of the complaint and costs.

Defendant, on the other hand, asserts that plaintiff should only be entitled to a reasonable royalty and that treble damages and attorneys fees are not appropriate. It also argues that the damages should be apportioned so as to exclude therefrom the value of those parts of the cart not covered by the patent such as the value of the cart itself including the wheels and tires. The applicable statute is 35 U.S.C. § 284, which provides as follows:

"Damages.—Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together

with interest and costs as fixed by the court. When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances. July 19, 1952, c. 950, § 1, 66 Stat. 813."

It will be noted that the owner of a patent is entitled to recover as a matter of law damages *adequate* to compensate him for the infringement but in *no event less than a reasonable royalty.* A reasonable royalty in the present case would not adequately compensate Saginaw for its loss.

There was undisputed evidence of loss of profits. The District Court found:

"The facts show that defendant purchased and used 1006 infringement carts from Irvin Industries. It is further clear that the infringing manufacturers occurred at defendant's insistence. While a patent had not yet issued, defendant well knew that it was taking a chance that any patent issued would be upheld as valid. In fact, defendant protected itself through an indemnity clause in the purchase contract. Plaintiff has further shown that at the time it was negotiating with Eastern for the purchase of the 1006 carts (unsuccessfully as it developed) it sold more than 200 identical carts to Eastern's competitors for $1,125.00 per cart at a profit margin of 15%. Testimony showed that the manufacturing cost of the carts was $1,087.00. Profit per car was $163.00.

Defendant offered no evidence to challenge any of these figures. Rather, it argues that the lost profit rationale for assessing damages is legally inappropriate. Defendant focuses its argument on its status as a user, arguing at page 3 of its brief on damages that plaintiff did not lose any sales to Eastern which is not a manufacturer. Defendant misappre-

hends the nature of the patent damage remedy. The issue is not, as defendant phrases it, whether 'the Patent Owner would have made the sales which the *infringer* has made,' (Brief, page 3, emphasis supplied), but, as previously indicated, 'had the Infringer not infringed, what would Patent Holder-Licensee have made.' *Livesay Window Co. v. Livesay Industries, Inc.,* 251 F.2d 469, 471 (5th Cir. 1958) quoted in *Aro Mfg. Co. v. Convertible Top Co.,* 377 U.S. [476] at 507, 84 S.Ct. 1526, 12 L.Ed.2d 457. Defendant plainly ordered the 1006 infringing carts from plaintiff's competitor in order to gain an economic advantage knowing that it might thereby deprive plaintiff of valuable sales. The fact that plaintiff's design was the model for the infringing carts merely serves to reinforce this conclusion. Had defendant not induced the manufacture of the carts by another company, plaintiff would have made these sales. There simply was no supplier other than plaintiff who could provide the type of equipment defendant needed without utilizing plaintiff's design. The purpose of damages, to make plaintiff whole, is best served by looking to lost profits."

The court allowed no more than the profit of $163 on each cart times 1006 carts which totaled $163,978.00. The court was required to make only a reasonable approximation of the amount of which the patent owner was entitled and owed no duty to exercise meticulous care to avoid hardship on Eastern. *Horvath v. McCord Radiator & Mfg. Co.,* 100 F.2d 326, 335 (6th Cir. 1938). This follows the rule in *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). The court made a reasonable approximation which we approve and it operated to permit Eastern to use the patented carts which it purchased from Irvin for the duration of the patents.

Eastern argues that the court's decision permits recovery of damages for a period

prior to the issuance of the two patents which were issued in 1973. This is not true. It allows only the profit on the carts which Eastern should have purchased from Saginaw. If Eastern had purchased the 1006 carts from Saginaw as it should have done in good conscience, this patent litigation would have been avoided. See 35 U.S.C. § 271.

Eastern could have used its own engineers to design the carts but this would undoubtedly have subjected it to considerable expense. Instead, Eastern furnished the specifications to Saginaw and other manufacturers of the cart it desired to purchase and subjected Saginaw to the cost and expense of the design which resulted in Saginaw applying for and obtaining two valuable patents.

With knowledge of the patent applications and in order to save money, Eastern connived with Irvin to manufacture the cart for it and furnished Irvin without Saginaw's consent, a model of Saginaw's carts which embodied the inventions described in the patent applications so that Irvin could copy them. Irvin having no development expenses, obviously could sell the 1006 carts with Saginaw's design to Eastern cheaper than could Saginaw which had included such expense in computing the sales price of the carts. Eastern obviously must have known that copying Saginaw's design for the carts without its consent would incur liability for damages, and in order to protect itself required Irvin to sign an indemnity agreement including defending Eastern in the event of a patent infringement suit which shortly followed. This was indeed shabby treatment of a small company struggling to emerge from a Chapter XI proceeding. Had all of Saginaw's customers treated it in the same manner it might not have been able to survive.

We find no merit in Eastern's contention that the value of parts of the cart not specifically covered by the invention should be apportioned. We previously pointed out that the two patents were combination patents and no apportionment is required. 8 Walker on Patents § 775, pp. 687–8 (Deller Ed. 1973).

## VI

■ Saginaw contends that it should be allowed treble damages and attorneys fees. This would have required a finding on the part of the District Judge that Eastern had exercised bad faith and that exceptional circumstances were involved with respect to attorneys fees.

As to whether Eastern exercised bad faith, this was a disputed and hotly contested issue of fact. The purchase of 1006 carts by Eastern from Irvin was made shortly before the patents were issued in 1973. The determination of the issue rested within the sound discretion of the District Court. We are unable to find any abuse of discretion on the part of the District Court. The apportionment of costs is likewise within the discretion of the court and we find it was not abused. We find no exceptional circumstances justifying any award of attorneys fees. The allowance of statutory interest from the date the damages were determined is correct.

In our opinion, the findings of fact of the District Court are supported by substantial evidence and they are not clearly erroneous.

The judgment of the District Court is affirmed. Costs are assessed against Eastern.
[See following illustrations.]

## Appendix A-1

PATENTED APR 17 1973

3,727,946

SHEET 1 OF 5

FIG.1

INVENTOR
LEO E. HEARN

BY

*Learman & McCulloch*

ATTORNEYS

## Appendix A-2

PATENTED APR 17 1973

3,727,946

SHEET 2 OF 5

FIG.2

INVENTOR
LEO E. HEARN
BY
Learman & McCulloch
ATTORNEYS

**Appendix A-3**

3,727,946

FIG.6

FIG.7

FIG.8

APPENDIX C

FIG.9

FIG.10

INVENTOR
LEO E. HEARN

BY
Learman & McCulloch

ATTORNEYS